# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

        Plaintiff,    :    Case No. 3:15-cr-169(2)
                                        Also 3:19-cv-041

                                        District Judge Thomas M. Rose
   - vs -                           Magistrate Judge Michael R. Merz

ANTONIO J. SPIVA,

        Defendant.    :

## REPORT AND RECOMMENDATIONS

    Defendant Antonio Spiva initiated this action by filing a Motion to Vacate under 28 U.S.C. § 2255 (ECF No. 167). The Motion is before the Court for initial review pursuant to Rule 4(b) of the Rules Governing § 2255 Proceedings which provides:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judge must order the United States to file an answer, motion, or other response within a fixed time, or take other action the judge may order.

    At the Dayton location of Court, all post-judgment collateral attacks on criminal convictions are automatically referred to the undersigned under General Order Day 13-01.

1

Spiva claims he received ineffective assistance of trial counsel because his trial counsel failed to explain to him the impact on his case of the Supreme Court decision in *Burrage v. United States* (Motion, ECF No. 167, PageID 889, citing 571 U.S. 204 (2014)). He also claims he received ineffective assistance of appellate counsel when his appellate attorney did not "appeal his sentence and conviction under *Burrage* rather than filing an *Anders* brief." *Id.* at PageID 896, citing *Anders v. State of California*, 386 U.S. 738 (1967). Finally, Defendant also raises a vague Fifth Amendment Due Process challenge to his conviction. *Id*. at PageID 895-96.

**Litigation History**

Spiva was indicted with co-defendant Charles McBeath on December 8, 2015. He was charged with conspiracy to possess with intent to distribute heroin and fentanyl in violation of 21 U.S.C. § 846 (Count One); distribution of fentanyl resulting in the death of Paul McElfresh in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Count 2); distribution of fentanyl resulting in the death of Jason Robinson (Count 3); distribution of heroin on May 25, 2015, in violation of of21 U.S.C. §§ 84l(a)(l) and (b)(l)(C) and 18 U.S.C. § 2 (Count 4); distribution of heroin on May 26, 2015, in violation of of21 U.S.C. §§ 84l(a)(l) and (b)(l)(C) and 18 U.S.C. § 2 (Count 5); distribution of heroin on May 27, 2015, in violation of of21 U.S.C. §§ 84l(a)(l) and (b)(l)(C) and 18 U.S.C. § 2 (Count 6); maintaining a place for manufacturing, distributing, and using heroin at 420 Bowen Street in Dayton in violation of 21 U.S.C. § 856(a)(1) (Count 7); maintaining another place for the same purposes at 2606 East Fifth Street, in Dayton, Ohio (Count 8); maintaining another place for the same purposes at 32 South Torrence Street in Dayton, Ohio (Count 9); and maintaining yet another place for the same purposes at 23 South Horton Street,

Dayton, Ohio (Count 10) (Indictment, ECF No. 6). The original Indictment was superseded twice (ECF Nos. 66, 129).

On January 9, 2017, Spiva entered into a Plea Agreement with the United States in which he agreed to plead guilty to one count of conspiracy to possess with intent to distribute heroin, fentanyl, and cocaine base (ECF No. 134, PageID 542). Spiva admitted his guilt of the offense to which he was pleading and

> [A]cknowledge[d] his responsibility for the conduct charged in counts two (2) through six (6), eight (8) through ten (10) and twelve (12) of the Second Superseding Indictment filed on January 5, 2017. Defendant further stipulates that the conduct charged in those counts may be considered by the United States Probation Department or by the District Court in calculating the guideline range and in imposing sentence. Pursuant to U.S.S.G. § 1B1.2 (a) and (c), this stipulation establishes the commission of additional offenses by the Defendant and shall be treated as if the Defendant had been convicted of the additional counts charging those offenses --- namely, counts two (2) through six (6), eight (8) through ten (10) and twelve (12) of the Second Superseding Indictment.

*Id.* at PageID 543, ¶ 3. The Plea Agreement was made pursuant to Fed. R. Crim. P. 11(c)(1)(C) and the parties agreed that an appropriate sentencing range was 144 to 216 months imprisonment. *Id.* at PageID 545, ¶ 9. Spiva acknowledged that the plea was knowing and voluntary and not the result of any threats or force. *Id.* at PageID 548, ¶ 18. He represented that he had reviewed the facts and circumstances of the case with his attorney Aaron Durden and was "fully satisfied with the representation, advice, and other assistance of his attorney in this case." *Id.* at PageID 548-49.

Judge Rose conducted a plea colloquy under Fed. R. Crim. P. 11 on January 9, 2017 (Transcript, ECF No. 158). Spiva was sworn to tell the truth as any witness would be. *Id.* at PageID 640. Assistant United States Attorney Dominick S. Gerace, II read the statement of facts into the record, including that a friend of Paul McElfresh purchased what she believed to be heroin from

3

the Defendant or a co-conspirator at the rear of Bob's Beer and Wine at 2501 East Third Street on May 25, 2015. *Id.* at PageID 645. The buyer delivered the drugs to McElfresh who used them, both heroin and fentanyl, and died. *Id.* at PageID 645-46. On the same day, Jason Robinson acquired fentanyl from Defendant, used it, and died. *Id.*. "As a member of the conspiracy, Spiva accepts responsibility for causing the deaths of Paul McElfresh and Jason Robinson." *Id.* at PageID 646. Mr. Gerace concluded:

> For the information of the Court, the parties agree and stipulate that the United States could prove at trial beyond a reasonable doubt that but for McElfresh using a mixture or substance containing a detectable amount of fentanyl, his death would not have occurred; and that but for Robinson using a mixture or substance containing a detectable amount of fentanyl, his death would not have occurred.

*Id.* at PageID 646-47. Immediately thereafter, Spiva agreed that those facts Gerace read were true. *Id.* at PageID 647.

As the colloquy continued, Mr. Durden told the Court that he and Spiva had calculated the Sentencing Guideline Range for the offense to which he was pleading as 17.5 years to 23 years, but that the Plea Agreement limited that to twelve to eighteen years(Transcript, ECF No. 158, PageID 658). After an explanation of the Plea Agreement, Spiva signed it and acknowledged that no one was threatening him to get him to sign it. *Id.* at PageID 667. He then pleaded guilty and Judge Rose found the plea was voluntary. *Id.* at PageID 669-70. Having previously discharged his first appointed attorney, Spiva sought to discharge Mr. Durden on the plea date. However, he withdrew that request prior to the plea. *Id.* at PageID 673.

After reviewing a Presentence Investigation Report from the Probation Office, Judge Rose sentenced Spiva to 180 months imprisonment, exactly in the middle to the range agreed on (ECF No. 143).

Spiva appealed and was appointed new counsel for appeal, Patrick Hanley (ECF No. 154). The Sixth Circuit affirmed the conviction and sentence. *United States v. Spiva*, No. 17-3730, 2018 U.S. App. LEXIS 13238 (6th Cir. May 21, 2018). In the course of its opinion it noted that "[a]round Memorial Day 2015, numerous drug overdoses, including two fatalities, occurred on the east side of Dayton." *Id.* at *1. The court reviewed de novo Spiva's claim that his plea was "invalid because he did not understand that he would be held accountable for the conduct charged in the dismissed counts[,]" including the deaths of McElfresh and Robinson. The court wrote:

> We review de novo the validity of Spiva's guilty plea. *United States v. Dixon*, 479 F.3d 431, 434 (6th Cir. 2007). A guilty plea is constitutionally valid if it is voluntary, knowing, and intelligent. *Brady v. United States*, 397 U.S. 742, 748, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970); Dixon, 479 F.3d at 434. In accordance with Rule 11, the district court "must verify that 'the defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual basis for concluding that the defendant committed the crime charged.'" Dixon, 479 F.3d at 434 (quoting *United States v. Webb*, 403 F.3d 373, 378-79 (6th Cir. 2005)). The record demonstrates that the district court substantially complied with Rule 11 and that Spiva's guilty plea was voluntary, knowing, and intelligent. See *United States v. Gardner*, 417 F.3d 541, 544 (6th Cir. 2005).
>
> Spiva asserts that his guilty plea was not voluntary because he did not understand that he would still be held accountable for the conduct charged in the dismissed counts. In calculating Spiva's guidelines range, the district court used the base offense level set forth in USSG § 2D1.1(a)(2), which provides for a base offense level of 38 "if the defendant is convicted under 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C) . . . and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance." The district court also imposed a 2-level increase pursuant to USSG § 2D1.1(b)(12) for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance." According to Spiva, the conduct charged in the

5

dismissed counts—specifically Counts 2 and 3 charging distribution of fentanyl resulting in death and Counts 8, 9, and 10 charging use and maintenance of a place for the purpose of distributing heroin and cocaine base—played a prominent role in the district court's sentencing decision.

The record belies the argument that Spiva did not understand that the conduct charged in the dismissed counts would be considered for sentencing purposes. In his plea agreement, Spiva acknowledged that he was responsible for the conduct charged in the dismissed counts and stipulated that the conduct charged in those counts could be considered by the probation office and by the district court in calculating the guidelines range and in imposing his sentence. The plea agreement further provided: "Pursuant to U.S.S.G. § 1B1.2(a) and (c), this stipulation establishes the commission of additional offenses by the Defendant and shall be treated as if the Defendant had been convicted of the additional counts charging those offenses . . . ." Spiva admitted to the statement of facts attached to the plea agreement, which provided that, as a member of the conspiracy to distribute controlled substances, he accepted responsibility for causing the deaths of Paul McElfresh and Jason Robinson. Spiva further admitted in the statement of facts that he and McBeath negotiated with their drug customers to allow them to package and sell drugs out of their customers' residences. At the plea hearing, the prosecutor read the statement of facts into the record. Spiva affirmed that the statement of facts was correct and represented the facts to which he wished to plead guilty. During the plea colloquy's sentencing discussion, defense counsel provided an estimated guidelines calculation using the same guidelines provisions, USSG § 2D1.1(a)(2) and (b)(12), ultimately used by the district court to calculate Spiva's guidelines range. Spiva was fully aware that the conduct charged in the dismissed counts would be considered for sentencing purposes.

Spiva further argues that the government cannot agree to the dismissal of charges and then seek to hold the defendant responsible for the conduct underlying the dismissed charges. Spiva obtained a substantial benefit in exchange for the government's dismissal of Counts 2 and 3, which charged him with aiding and abetting the distribution of fentanyl resulting in death, in violation of 18 U.S.C.

> § 2, 21 U.S.C. § 841(a)(1) and (b)(1)(C), and *Pinkerton*. If he had been convicted of either count, Spiva would have been subject to a 20-year mandatory minimum. See 21 U.S.C. § 841(b)(1)(C). Spiva's plea agreement provided for a significantly lower sentencing range of 144 to 216 months of imprisonment. Spiva cannot argue that his plea agreement was illusory.

*Id.* at *3-6. Spiva did not seek further review by the United States Supreme Court, but filed the instant § 2255 Motion February 11, 2019 (ECF No. 167).

# Analysis

Spiva claims he received ineffective assistance of trial counsel and of appellate counsel in that neither Mr. Durden nor Mr. Hanley appropriately applied the law as stated in *Burrage* to this case.

The governing standard for ineffective assistance of trial counsel was adopted by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

7

466 U.S. at 687. In other words, to establish ineffective assistance, "a defendant must show both deficient performance … and prejudice." *Berghuis v. Thompkins,* 560 U.S. 370, 389 (2010) (ellipsis in original), quoting *Knowles v. Mirzayance,* 556 U.S.111, 122 (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689, quoting *Michel v. State of Louisiana*, 350 U.S. 91, 101 (1955).

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694. *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987).

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at trial, counsel who acts as an advocate rather than merely as a friend of the court. *Penson v. Ohio,* 488 U.S. 75 (1988); *Evitts v. Lucey,* 469 U.S. 387 (1985); *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The *Strickland* test applies to appellate counsel. *Smith v. Robbins,* 528 U.S. 259, 285 (2000); *Burger v. Kemp,* 483 U.S. 776 (1987). To evaluate a claim of ineffective assistance of appellate counsel, then, the court must assess the strength of the claim that counsel failed to raise. *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011), citing *Wilson v. Parker,* 515 F.3d 682, 707 (6th

8

Cir. 2008).

In sum, a defendant claiming ineffective assistance of counsel must show both deficient performance by the attorney and resulting prejudice.

In *Burrage v. United States,* 571 U.S. 204 (2014), the Supreme Court definitively interpreted the language in 21 U.S.C. § 841(b)(1)(C), which provides a sentence enhancement – a mandatory twenty-year sentence – if death "results from" the sale of drugs to another person. The lower courts had approved a jury instruction which allowed conviction if the sold drugs were a contributing cause in the death; the Supreme Court held the drugs must be a "but for" cause of the death. *Id*. at 219. The Court further held that because the resulting death substantially increased the mandatory minimum sentence for drug dealing, "but for" causation is an essential element which must be proven to the jury beyond a reasonable doubt or admitted by a defendant as part of a valid guilty plea. *Id*. at 210.

Having recited these two holdings of *Burrage*, Spiva continues: "Here at bar there is not one scintilla of evidence that Jason Robinson or Paul McElfresh died from drugs distributed from the Petitioner or more importantly, that they would have survived had they not ingested the alleged drugs distributed by Petitioner!" (Motion, ECF No. 167, PageID 891). Spiva then directs the Court's attention to Coroner's Reports on both victims and asks questions about why a syringe was not found near McElfresh's dead body and what role cocaine played in Robinson's death. *Id*. at PageID 891, 892.

As to McElfresh, the Coroner's opinion was that his death was caused by acute intoxication by the combined effects of fentanyl and heroin (Motion, ECF No. 167, PageID 906). As to Robinson, his opinion was that the cause of death was acute fentanyl intoxication. *Id.* at PageID 917. Thus, the Coroner's Reports do not support Spiva's claim that the drugs he sold were not the

9

but for cause of these two deaths. Nothing in them suggests further investigation would have proved anything else contributed to these deaths.

"But for" causation does not mean sole causation. Drug dealers must take their customers as they find them. If a victim is in a weakened or susceptible condition for some other reason, including being a long-term drug user, the question is whether, given that condition or conditions, the illicit drug was a sufficient cause to kill them. As Justice Scalia explained in *Burrage*, fitting it into traditional legal understandings of causation:

> The law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause. H. Hart & A. Honor, Causation in the Law 104 (1959). When a crime requires "not merely conduct but also a specified result of conduct," a defendant generally may not be convicted unless his conduct is "both (1) the actual cause, and (2) the 'legal' cause (often called the 'proximate cause') of the result." 1 W. LaFave, Substantive Criminal Law §6.4(a), pp. 464-466 (2d ed. 2003) (hereinafter LaFave); see also ALI, Model Penal Code §2.03, p. 25 (1985). Those 2 categories roughly coincide with the two questions on which we granted certiorari. We find it necessary to decide only the first: whether the use of heroin was the actual cause of Banka's death in the sense that §841(b)(1)(C) requires.
>
> The Controlled Substances Act does not define the phrase "results from," so we give it its ordinary meaning. See *Asgrow Seed Co.* v. *Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995). A thing "results" when it "[a]rise[s] as an effect, issue, or outcome *from* some action, process, or design." 2 The New Shorter Oxford English Dictionary 2570 (1993). "Results from" imposes, in other words, a requirement of actual causality. "In the usual course," this requires proof "'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. 338, 346–347, 133 S. Ct. 2517, 186 L. Ed. 2d 503 at 514 (2013) (quoting Restatement of Torts §431, Comment *a* (1934)). The Model Penal Code reflects this traditional understanding; it states that "[c]onduct is the cause of a result" if "it is an antecedent but for which the result

in question would not have occurred." §2.03(1)(a). That formulation represents "*the minimum* requirement for a finding of causation when a crime is defined in terms of conduct causing a particular result." *Id.*, Explanatory Note (emphasis added); see also *United States* v. *Hatfield*, 591 F. 3d 945, 948 (C.A.7 2010) (but for "is the minimum concept of cause"); *Callahan* v. *Cardinal Glennon Hospital*, 863 S. W. 2d 852, 862 (Mo. 1993) (same).

Thus, "where A shoots B, who is hit and dies, we can say that A [actually] caused B's death, since but for A's conduct B would not have died." LaFave 467-468 (italics omitted). The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back. Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived. See, *e.g., State* v. *Frazier*, 339 Mo. 966, 974-975, 98 S. W. 2d 707, 712-713 (1936).

This but-for requirement is part of the common understanding of cause. Consider a baseball game in which the visiting team's leadoff batter hits a home run in the top of the first inning. If the visiting team goes on to win by a score of 1 to 0, every person competent in the English language and familiar with the American pastime would agree that the victory resulted from the home run. This is so because it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter. It is beside the point that the victory also resulted from a host of *other* necessary causes, such as skillful pitching, the coach's decision to put the leadoff batter in the lineup, and the league's decision to schedule the game. By contrast, it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event. If the visiting team wound up winning 5 to 2 rather than 1 to 0, one would be surprised to read in the sports page that the victory resulted from the leadoff batter's early, non-dispositive home run.

571 U.S. at 210-12. Thus, the Coroner's Reports in this case completely support a finding that

11

Spiva's actions were the but for cause of McElfresh and Robinson's deaths within the meaning of *Burrage*.

Moreover, at the time of his plea, Spiva admitted under oath that the drugs he sold were a but for cause of these two deaths and that the United States could prove those two facts by proof beyond a reasonable doubt (Transcript, ECF No. 158, PageID 646-47). Thus, the United States Attorney and Mr. Durden had already taken the *Burrage* causation standard into account, and the guilty plea reflected that standard. Consequently, there are sufficient facts of record to support a finding that Spiva's acts caused the deaths of McElfresh and Robinson within the meaning of *Burrage*. Had the case proceeded to trial and the Government had proved the facts to which Spiva admitted, he could readily have been convicted and been subject to a sentence of twenty years to life for each death.

Of course, by accepting the Plea Agreement here, Spiva protected himself from that possible sentence. He admits he understood this and it motivated his guilty plea:

> I fully considered proceeding to trial on the basis of what I knew my actions to be, However, I decided against going to trial when I was told that my minimum sentence had moved from 60 months to 240 months, where I also could fact a life sentence. The deciding factor for my declining my jury trial rights was when my Counsel told me that I would get "life" if I went to trial.

(Spiva Decl., ECF No. 167, PageID 899-900, ¶ 4.) From all that this Court knows, Mr. Durden's advice was perfectly correct: the Government had the required proof of causation and the resulting sentence would have been somewhere between twenty years and life. The alleged fact that Mr. Durden did not explain the *Burrage* decision to Spiva, *id*. at PageID 899, ¶ 2, is of no consequence because the results of the plea completely conform to the *Burrage* standard.

Spiva now says he would not have signed a Plea Agreement "containing any language

implicating me in the deaths of anyone if I was not scared into signing the plea because I would get 'life' if I proceeded to trial." (Spiva Decl., ECF No. 167, PageID 900, ¶ 7). If, by this language, Spiva is implying that he was not responsible for those two deaths, then he lied at the plea colloquy when he admitted responsibility. If, on the other hand, he is still admitting that he was responsible, but believed the Government could not prove that responsibility at trial, yet gave up his right to a jury trial because he was frightened he might be wrong in that belief, that is exactly what plea bargaining involves: giving up the possibility of acquittal for the certainty of a lesser sentence. To claim that one was frightened of the harsher sentence is not to claim anything anyone who plea bargains could not claim.

Spiva also claims that Mr. Durden's failure to seek a suppression hearing was ineffective assistance of trial counsel (Motion, ECF No. 167, PageID 893). However, this claim is purely conclusory. Suppression hearings are used to exclude prior to trial the results of searches that violate the Fourth Amendment. Spiva has not begun to suggest what evidence the Government had in its possession that had been seized from him in violation of the Fourth Amendment. The *Burrage* case has nothing to say about suppression of evidence.

As noted above, both Judge Rose and the Sixth Circuit found Spiva's guilty plea was a valid one. He cannot raise again under 28 U.S.C. § 2255 that question, which was conclusively answered on appeal. He appears to realize that because he claims his plea was invalid because of ineffective assistance of trial counsel, "i.e., failure to suppress evidence pursuant to *Burrage*." (Motion, ECF No. 167, PageID 895.) But as just noted, *Burrage* has nothing to do with suppression and the *Burrage* causation standard was taken into account in the plea proceedings. Spiva also claims ineffective assistance of appellate counsel because Mr. Hanley failed "to appeal his sentence and conviction under *Burrage* rather than filing an *Anders* brief." *Id.* at PageID 896.

Spiva suggests that because his role in the conspiracy was minor and based "on the amount of narcotics discussed in this case, Petitioner could have received a sentence of less than ten (10) years, if he did not receive a mandatory minimum of five years." *Id.* at PageID 893. Spiva's presentence investigation report tells a different story. Spiva personally delivered the heroin and fentanyl to D.C., McElfresh's roommate, at Bob's Beer and Wine on May 25, 2015 (Final PSR, p. 9 ¶ 24). After McElfresh died, D.C. ordered more of the same on May 26, 2015, injected it and overdosed, but was revived with Narcan. *Id*. at ¶ 25. Spiva and his co-defendant were selling heroin and cocaine out of Robinson's residence and supplying him with drugs, *Id*. at p. 10, ¶ 28; Spiva was probably the last person to see Robinson alive. After his death, "McBeath and Spiva continued to sell the same heroin/fentanyl combination that killed Robinson, warning at least one customer: 'This is what Jason fell out on.'" *Id*. at ¶ 29. The report details many other heroin/fentanyl sales in the East Dayton inner city around Memorial Day 2015. Many of them resulted in overdoses that would have been fatal but for[1] Narcan responses by emergency responders. Yet knowing their product had caused Robinson's death, they continued to sell it. To suggest that the United States Attorney would have been satisfied with a five-year sentence in this case is completely incredible. Such an agreement would have completely undercut the stated federal commitment to end the opioid crisis which brought Dayton so much unwanted national attention. No rational defendant would have wanted to face a jury and risk life imprisonment under those circumstances.

**Conclusion**

---

[1] These word are used advisedly. Narcan was the only thing that prevented these persons from dying.

Based on the foregoing analysis, it is respectfully recommended that Spiva's § 2255 Motion be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

May 30, 2019.

s/ *Michael R. Merz*<br>United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140, 153-55 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).